**FOURTH DIVISION**
**DOYLE, P. J.,**
**ANDREWS and BOGGS, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**November 19, 2012**

# In the Court of Appeals of Georgia

A12A1419. DeKALB COUNTY v. BAILEY et al.
A12A1420. THOMPSON v. BAILEY et al.

ANDREWS, Judge.

Officer Torrey Thompson and DeKalb County appeal from the trial court's order denying their motions for summary judgment on claims filed against them after the shooting death of Lorenzo Matthews. Joshua Bailey, Matthews's minor child, and Nicola Hatten, Matthews's mother and the executor of his estate, brought claims under 42 U.S.C. § 1983 and under state law for assault and battery, wrongful death, breach of duty, attorney fees, and punitive damages.[1] For reasons that follow, we affirm the denial of summary judgment to Thompson and reverse the denial of summary judgment to DeKalb county.

---

[1] They did not pursue the claims for assault and battery, wrongful death, or punitive damages against DeKalb County.

Thompson, a police officer with the DeKalb County Police Department, shot Lorenzo Matthews during an encounter at the apartment complex where Matthews lived. Thompson was indicted for the murder of Matthews and the case went to the Georgia Supreme Court on appeal from the trial court's grant of Thompson's motion to suppress his statements following the shooting, and the denial of his claim of immunity. The Supreme Court set out the facts as follows:

> At approximately 3:15 a.m. on September 12, 2006, the DeKalb County Police Department (DKPD) received a 911 call reporting a stolen motor vehicle from an apartment complex. Officer R. L. Knock, Sergeant Berg, and Officer Torrey Thompson, among others, were called to the scene. Police interviewed the complainant, Earl McCord, who stated that his car, a Monte Carlo, had been stolen from outside his apartment. Police then interviewed Ms. Mullins, another resident of the apartment complex, who told police that the car had not been stolen, but had been involved in a hit-and-run car accident (involving the Monte Carlo and her car), and that the drivers and passengers of the Monte Carlo were friends and relatives of McCord. Ms. Mullins directed police to apartments 38 and 40, and told them Lorenzo Matthews, who was involved in the hit-and-run incident, lived there.

> Officer Nunn, another policeman on the scene, recognized Matthews' name and alerted his colleagues to the fact that Matthews was wanted for questioning regarding a shooting incident in a nearby apartment

2

complex, as well as for assaulting a police officer. Mullins added that Matthews was known to be armed.

Under the supervision of Sgt. Berg, the police decided to interview Matthews. Sgt. Berg and two other officers went to the front door of apartment 38. He ordered Thompson and Knock to cover the back of the apartment building in case Matthews attempted to escape. Berg knocked at apartment 38 but was told Matthews was not there. Thompson and Knock noticed someone looking through the blinds of a window in apartment 40. When Berg went to knock at apartment 40, the rear door of the apartment swung open, and Matthews came out onto the porch. He pointed at Thompson with an object in his hand. Witnesses claimed the object was a cell phone. To both Thompson and Knock, the object looked like a weapon. However, in spite of an extensive search, a weapon was not found at the scene.

Knock ordered Matthews to stop and drop the object. Matthews began running down the staircase and jumped toward Knock, who fired at Matthews four times. Matthews then ran toward Thompson, still holding the object in his hand. Knock shouted, "Shoot him!" and, after hesitating briefly, Thompson fired two rounds at Matthews.

Matthews then ran away from Thompson toward a wooded area adjacent to the apartment complex; Thompson pursued on foot. Recognizing that the woods would afford Matthews a tactical offensive advantage, Thompson intermittently fired at Matthews as he ran. Thompson testified that he was fearful both for his life and for the lives of the

residents of the apartment complex. When Matthews entered the wooded area, Thompson fired once more before Matthews jumped over a fence. At that point, Thompson ceased pursuit and called for backup. Matthews' body was found later by a K9 unit on the other side of the fence. He had sustained eight gunshot wounds, two of which were found to be fatal.

*State v. Thompson*, 288 Ga. 165, 166-167 (702 SE2d 198) (2010).

The Supreme Court affirmed the trial court's grant of Thompson's motion to suppress statements he made during the investigation of the shooting and also affirmed the denial of Thompson's claim of immunity, holding as follows: "To avoid trial under OCGA § 16–3–24.2, a defendant must show that he is entitled to immunity by a preponderance of the evidence. *State v. Bunn,* 288 Ga. 20 (701 SE2d 138) (2010); *Bunn v. State,* 284 Ga. 410, 413 (667 SE2d 605) (2008). We agree with the trial court that Thompson did not carry his burden of showing he was justified in using deadly force. *State v. Bunn,* supra." Id at 169.[2]

---

[2] As a result of the Supreme Court's holding, the State did not proceed with the criminal case against Thompson and the charges were nolle prossed.

After Bailey and Hatten (Plaintiffs, Appellees) filed this civil suit against Thompson and DeKalb County, defendants moved for summary judgment. The trial court denied both motions and this appeal followed.

Case Number A12A1420

In this case, Thompson appeals the denial of his motion for summary judgment.

1. First, Thompson argues that the trial court erred in denying his motion on the 42 U.S.C. § 1983 claim because he is entitled to qualified immunity. That Code section provides, in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

"Claims that law enforcement officials have used excessive force in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen are most properly characterized as invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable seizures,' and must be judged by reference to the Fourth Amendment's

5

'reasonableness' standard." *Graham v. Connor*, 490 U. S. 386, 387 (109 SC 1865, 104 LE2d 443) (1989).

"The test for determining whether a defendant is protected from suit by the doctrine of qualified immunity is the objective reasonableness of the defendant's conduct as measured by reference to clearly established law. On a motion for summary judgment, if the applicable law was clearly established at the time the defendant acted [and it prohibited the action], the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." (citations omitted) *Porter v. Massarelli*, 303 Ga. App. 91, 93 (692 SE2d 722) (2010).

The record shows that, at the crime scene walk-through, Thompson stated that Matthews came to the railing, leaned over, and had an "unknown object" in his hand. As Matthews ran away, he had one hand to his side and was holding his other hand against his body as though he was holding something. . An eyewitness testified that when Matthews went out the door, he had a cell phone in his hand. Two other eyewitnesses said that when Matthews ran past them, he did not have anything in his hand.

6

The trial court stated that the evidence showed that, at the time of the shooting, Thompson did not know the identity of the person who came running down the stairs. And, even if it was reasonable to shoot as Matthews ran toward the other officer, there were issues of fact as to the reasonableness of resuming fire after Matthews was running away. Further, the court held that there was no probable cause to believe there was imminent danger when "Matthews was fleeing headlong, had dropped his cell phone (misperceived previously as a weapon), and was screaming for help."

"Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Tennessee v. Garner*, 471 U. S. 1, 11-12 (105 SC 1694, 85 LE2d 1) (1985).

In this case, Thompson was never threatened with a weapon and did not have probable cause to believe that the man running away had committed a crime involving serious physical harm. The evidence is undisputed that Thompson never

saw a weapon in Matthews' hand; that Matthews never turned towards him while running away from him; and that Matthews never fired a shot at Thompson, or ever threatened Thompson. Further, "[w]hen the shooting occurred, clearly established law provided that an officer's use of deadly force to apprehend a suspect violated the suspect's Fourth Amendment rights where the suspect posed no immediate threat to the officer and no threat to others." *Porter*, supra at 93. Accordingly, the trial court did not err in denying Thompson's motion for summary judgment on the grounds that he was entitled to qualified immunity for plaintiffs's claims under 42 U.S.C. § 1983.

2. Thompson also claims the trial court erred in denying his motion for summary judgment on the state law claims because he is entitled to official immunity.

> [A]n officer who, in the performance of his official duties, shoots another in self-defense is shielded from tort liability by the doctrine of official immunity. One who acts in self-defense does not act with the tortious intent to harm another, but does so for the non-tortious purpose of defending himself. OCGA § 51-11-1. Because an officer does not lose the right to defend himself when he acts in his official capacity, we hold that an injurious work-related act committed by an officer, but justified by self-defense, comes within the scope of official immunity. Thus, if [Thompson] shot [Matthews] intentionally and without justification, then [he] acted solely with the tortious "actual intent to cause injury." See *Gardner v. Rogers*, 224 Ga. App. 165, 169 (4) (480 SE2d 217) (1996). On the other hand, if [he] shot [Matthews] in self-

8

defense, then [he] had no actual tortious intent to harm him, but acted only with the justifiable intent which occurs in every case of self-defense, which is to use such force as is reasonably believed to be necessary to prevent death or great bodily injury to themselves or the commission of a forcible felony. OCGA §§ 16-3-21 (a); 51-11-1.

*Kidd v. Coates*, 271 Ga. 33, 34 (518 SE2d 124) (1999). "The phrase actual intent to cause injury has been defined in a tort context to mean an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury. This definition of intent contains aspects of malice, perhaps a wicked or evil motive." Id at 33.

The trial court held that Thompson was not entitled to official immunity because he was not justified in shooting Matthews when Matthews was running away from him. For the reason set out in Division 1 above, we agree and affirm the denial of summary judgment on these grounds.

3. Likewise, in light of our holdings in Divisions 1 and 2, we agree with the trial court's holding that Thompson was not otherwise entitled to summary judgment on the state law claims because he was not acting in self-defense or defense of others for purposes of OCGA § 16-3-20 (2); OCGA § 16-3-21 (a).

Case Number A12A1419

In this case, DeKalb County appeals from the trial court's order denying its motion for summary judgment on plaintiffs' claim under 42 U.S.C. § 1983. Plaintiffs alleged that the County was liable under section 1983 because the "policies, practices, or customs of DeKalb County, through the DeKalb County Police Department, were the moving force behind the constitutional deprivations suffered by Mr. Matthews."

In *Monell v. Dept. of Social Svcs. of City of N.Y.,* 436 U. S. 658 (98 SC 2018, 56 LE2d 611) (1978), the U. S. Supreme Court held that local governments could be sued directly under section 1983 as follows:

> Our analysis of the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies. Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

10

On the other hand, the language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor -- or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.

Id at 690-691.

In *City of Canton, Ohio v. Harris*, 489 U. S. 378 (109 SC 1197, 103 LE2d 412) (1989), the Supreme Court further explained:

The inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train in a relevant respect amounts to deliberate indifference to the constitutional rights of persons with whom the police come into contact. . . . Only where a failure to train reflects a "deliberate" or "conscious" choice by the municipality can the failure be properly thought of as an actionable city "policy." *Monell* will not be satisfied by a mere allegation that a training program represents a policy for which the city is responsible. Rather, the focus must be on whether the program is adequate to the tasks the particular employees must perform, and if it is not, on whether such inadequate training can justifiably be said to represent "city policy." Moreover, the identified deficiency in the training program must be closely related to the ultimate injury.

11

Id at 379.

In this case, the trial court held that there was a pattern of unjustified shootings that was "some evidence" that the County was on notice of the need for further training on use of force. The trial court determined that the punishment appeared insufficient for certain incidents where there was found to be an excessive use of force. The court held that Lt. Kaulbach, the officer responsible for putting together the "use-of-force" training materials, had "unchecked authority" for four years without any effective supervisor and therefore was the final policy maker with regard to these issues. The court stated that the training slides prepared by Kaulbach, particularly the slide about shooting persons in the back and the inclusion of certain videos were "evidence from which a jury could conclude that the county inadequately trained its officers on use of force." The court also found that Thompson received no discipline as a result of the shooting and was given a favorable performance appraisal for that time period.

4. First, we note that although the trial court found that Thompson received no discipline after the incident, the record shows that, as a result of the shooting, a determination was made to terminate Thompson. Thompson testified that he was

called in and told that his termination was being recommended. As a result, Thompson immediately submitted a resignation letter.

5. Next, the trial court found that unjustified shootings and other instances of excessive force were some evidence that the County was deliberately indifferent to the need to improve its training. The record shows that there were nine unjustified shootings between the years 2002 and 2006. But there are approximately 1000 police officers employed by DeKalb County. Without more than these bare figures, the court could not know whether this was notice of inadequate training. As the court states, there was one shooting in 2002, one in 2003, two in 2004, none in 2005, and five in 2006, one of which occurred after the shooting. Of the four that occurred in 2006, three were within three months of the Matthews' shooting.

Further, the trial court stated that plaintiffs pointed out multiple instances in which excessive force was used and "insufficient discipline was meted out." These incidents were not similar to the Matthews' shooting,[3] and indeed, none of the prior

---

[3] Further, as was pointed out at the motion hearing, this allegation was based on business records produced by the County that merely identified the incidents in which it had been determined that excessive force was used and stated the punishments assessed. There was no deposition testimony or any other evidence submitted from which a determination could be made that the punishments were not appropriate.

shootings or excessive use of force cases were similar to the shooting in this case. See *Mercado v. City of Orlando*, 407 F3d 1152, 1162 (11th Cir. 2005) (plaintiff cannot establish *Monell* claim because he cannot show that any of the prior incidents involved factual situations that are substantially similar to the case at hand); *Gold v. City of Miami,* 151 F3d 1346, 1351 (11th Cir. 1998) (holding that plaintiffs were not likely to succeed on the merits of their failure-to-train claim without proof that the City was aware of a prior incident in which constitutional rights were similarly violated); *Watson v. Mayor &c. of Savannah,* 223 Ga. App. 399, 401-402 (477 SE2d 667) (1996) (alleged deficiency "must be closely related to the ultimate injury," because "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city could have done to prevent the unfortunate incident").

Most importantly, of the fatal shootings that occurred in 2006, a Grand Jury found that all were justified except the Matthews shooting. See *Wright v. Sheppard,* 919 F2d 665, 674 (11th Cir.1990) (no liability on the sheriff's department for failure to train where there was "no evidence of a history of widespread prior abuse" to put the sheriff on notice that improved training or supervision was needed).

14

6. The trial court found that certain slides and videos used in the "use of force" training classes were evidence from which a jury could conclude that the County inadequately trained its officers, pointing out Thompson's statement that he shot Matthews because that was what his training taught him to do. One of the slides stated: "suspect shot in the back should be the norm and not the exception." Plaintiffs' expert testified that this and other slides, by themselves, without questions or discussions, were not proper training. But Officer Inlow, who apparently taught the latest session that Thompson attended, explained in his deposition that subsequent slides in the presentation answered or otherwise addressed those statements. Inlow said "You've got to explain" the slide." He was asked: "You never taught anyone that it was okay to shoot a suspect in the back?" Answer: " No." And, "I explained that scenario based on -- to each group so they would understand I'm not telling people, guys running, you shoot him in the back." Rather, the training alerted officers to the fact that a fleeing suspect who is armed can turn and shoot before an officer can respond and pull the trigger; therefore, by the time the officer shoots, the persons will have turned back around and any shot fired would hit them in the back.

Lt. Kaulbach, who developed the training materials, testified at her deposition that the slide stating "suspect shot in the back should be the norm and not the

15

exception," was taught under the scenario of a person whom the officers "knew to be armed with a firearm." Moreover, all of the other officers who taught the in-service training denied that this was ever taught as "it was okay to shoot people in the back."

Officer Thompson's expert testified that he reviewed the County's "use of force" policy and found it to be "consistent with those of every other police department and law enforcement agency" that he had reviewed. Plaintiffs's expert criticized the training to the extent that he thought there was no further instruction given, which was not the case. Therefore, although Thompson stated that he shot Matthews because that is what his training told him to do, the record shows that the training was not incorrect. That Thompson was not justified in his belief that Matthews could be armed and could pose a threat to him or others, does not render the training invalid. "[T]he focus must be on adequacy of the training program in relation to the tasks the particular officers must perform," and not merely on the training deficiencies for a particular officer. *Canton,* 489 U. S. at 390. "It is thus irrelevant what training each specific officer present at the scene was given or retained." *Lewis v. City of West Palm Beach, Fla.*, 561 F3d 1288, 1293 (11th Cir. 2009).

7. Finally, the trial court points to evidence submitted by plaintiffs that the County did not provide night-time or "hands-on" training on "when to shoot." We note that there was evidence of simulation or scenario training at a place identified only as Brook Run. There is also evidence that the Commission on Accreditation for Law Enforcement Agencies re-accredited DeKalb County Police Department for the sixth time in December 2007, after reviewing its policies, procedures and training.

In any event, it is not sufficient to point to instances where the County's training or facilities may be lacking. The burden is on plaintiffs to show a "deliberate or conscious choice" or such "deliberate indifference," by pointing to evidence that "the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold v. City of Miami,* supra at 1350. "[I]t is not sufficient to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip [that officer] to avoid the particular injury-causing conduct." *Russell v. Barrett*, 296 Ga. App. 114, 122 (673 SE2d 623) (2009) citing *City of Canton v. Harris*.

> This high standard of proof is intentionally onerous for plaintiffs; imposing liability on a municipality without proof that a specific policy caused a particular violation would equate to subjecting the municipality to respondeat superior liability-a result never intended by section 1983.

17

As the Supreme Court has explained, [t]o adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities.

*Gold*, supra at 1351.

Accordingly, we conclude that the trial court erred in finding that any or all of the above incidents was sufficient to show that the County failed to train its officers to such an extent that it amounted to "deliberate indifference to the constitutional rights of persons with whom the police come into contact." *City of Canton*, 489 U. S. at 379. Therefore, the trial court erred in denying DeKalb County's motion for summary judgment on plaintiffs's claim under 42 U.S.C. § 1983.

*Judgments affirmed in part and reversed in part. Doyle, P. J., and Boggs, J., concur.*

18